John J. McGrath (JM-2787)
Law Office of John J. McGrath
114 Old Country Road, Suite 212
Mineola, New York 11501
(516) 203-4009 ext 102

Attorney for Plaintiff(s)
D.M., J.M. and E.M. et al.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D N.Y

★   APR 1 8 2012   ★

LONG ISLAND OFFICE

**SUMMONS ISSUED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

D. M., J.M. and E.M.

<u>COMPLAINT</u>

    Plaintiff(s),

        -against-

**CV 12 1917**

Civil Action No.:    - CV

ROCKVILLE CENTRE UNION FREE SCHOOL DISTRICT

**SPATT, J.**

        Defendant.

**LINDSAY, M.**

------------------------------------------------------------------------X

COMPLAINT IN APPEAL OF A DECISION BY
<u>THE NEW YORK STATE REVIEW OFFICER</u>

Plaintiff's D.M., J.M. and E.M., by and through their attorney, John J. McGrath, ESQ.,

file this complaint appealing a decision of the New York State Review Officer denying their

request to be reimbursed their tuition and other costs related to their unilateral placement of B.

M. at the Lawrence Woodmere Academy in Woodmere, New York pursuant to the Individuals

with Disabilities Education Act ("IDEA").

<u>PRELIMINARY STATEMENT</u>

Plaintiff(s), through the undersigned attorney, bring this action to appeal a decision of the

New York State Review Officer, pursuant to 20 U.S.C. § 1415, Et. Seq., of the IDEA denying

1

Plaintiffs claims for tuition reimbursement for their son's unilateral educational placement at the Lawrence Woodmere Academy ("LWA").

JURISDICTION AND VENUE

1.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that it arises under 20 U.S.C. § 1415 of the IDEA, 20 U.S.C. § 1400 et seq., as amended.

2.     Jurisdiction is vested in this Court under the IDEA, 20 U.S.C. § 1415(i)(3)(A). Venue in the Court is also proper under 28 U.S.C. 1391(B) in that Plaintiffs reside within the Eastern District of New York, the Defendants are located within the Eastern District of New York, and the acts and/or omissions giving rise to the claims in this complaint occurred within the Eastern District of New York.

PARTIES

3.     The Plaintiffs, D.M., J.M. are the parents of E.M. The family resides at 98 Atkinson Road, Rockville Centre, New York 11570 which is within the boundaries of the Rockville Centre Union Free School District.

4.     The Defendant, Rockville Centre Union Free School District is a public school district duly organized and existing under the laws of the state of New York and located within Nassau County, New York. At all times relevant herein, the Defendants are and were the Local Educational Agency ("LEA") responsible for providing E. M. with a Free Appropriate Public Education ("FAPE").

EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.     Plaintiffs filed a demand for a due process hearing on or about February 2, 2010.

6.    A hearing was duly conducted, as required by the applicable statutes and regulations, and the Impartial Hearing Officer ("IHO") issued a determination adverse to Plaintiffs dated November 6, 2011. (Attached hereto as Exhibit 1.)

7.    Plaintiff filed a Petition for Review with the State Review Officer ("SRO") for the New York State Education Department ("NYSED") on November 28, 2011.

8.    The SRO issued a determination adverse to the Plaintiffs dated January 19, 2012. (Attached hereto as Exhibit 2.)

9.    With the decision of the SRO dated January 19, 2012 all administrative remedies have been exhausted.

## STATEMENT OF FACTS

10.    E. M.'s parents filed a request for due process with the respondent dated February 2, 2010 alleging that respondent failed to offer their daughter a FAPE and requesting reimbursement for unilaterally placing her at the Lawrence Woodmere Academy for the 2009-2010 school year.

11.    Between June 21, 2010 and June 20, 2011 a hearing was conducted.

12.    The IHO issued his decision dated October 6, 2011.

13.    Petitioners filed a Notice of Intent to Seek Review of the IHO's determination on November 1, 2011.

14.    Petitioners timely served Respondent with a Petition for Review on December 15, 2011.

15.    In a decision dated January 19, 2012 the SRO issued a decision in favor of Respondent denying all of Plaintiff's claims and remedies.

3

## CAUSE OF ACTION

16.     Plaintiffs hereby incorporate by reference the foregoing allegations in their Complaint as if stated more specifically herein, and further state that the SRO Decision denying the Petition is reversible error.

17.     Plaintiff's except from each and every one of the SRO's rulings on the merits of the case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

a.   That the Court issue an Order vacating the SRO decision dated January 19, 2012; AND

b.   That the Court issue an Order in favor of Plaintiffs on all issues denied or not considered by the SRO in the petition filed by Plaintiffs with the SRO; AND

c.   That the Court issue any other remedy it deems just and proper under the circumstances.

DATED:     April 18, 2012
           MINEOLA, NEW YORK

Respectfully submitted,

John McGrath (JM 2787)
114 Old Country Road, Suite 212
Mineola, New York 11501
(516) 203-4009 ext 102

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
D. M., J.M. and E.M.

                   Plaintiff(s),

        -against-

ROCKY POINT UNION FREE SCHOOL DISTRICT

                  Defendant.
-------------------------------------------------------------------------X

DECLARATION OF
JOHN J. McGRATH

Civil Action No.:  - CV

     JOHN J. McGRATH, an attorney admitted to practice before this Court, declares under penalty of perjury the following:

    1.     I am the attorney of record for the Plaintiffs, D.M., C.M. and E.M., in the above captioned matter. This declaration is submitted in support of Plaintiff's appeal of a decision by the New York State Review Officer ("SRO") denying their appeal of a decision of an Impartial Hearing Officer ("IHO") as being untimely.

    3.     Attached hereto as Exhibit 1 is a true and correct copy of the decision of the SRO (11-155) in an appeal of the adverse decision of the IHO dated January 19, 2012.

    4.     The attached complaint is submitted based upon the undersigned's knowledge of the matter as attorney for the Plaintiffs at the impartial hearing in 2010.

Executed on April 18, 2012

_____
John J. McGrath (JM-2787)
114 Old Country Road, Suite 212
Mineola, New York 11501
(516) 203-4009 ext 102

# EXHIBIT 1



# The University of the State of New York

## The State Education Department
### State Review Officer
#### www.sro.nysed.gov

No. 11-155

**Application of a STUDENT WITH A DISABILITY, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Rockville Centre Union Free School District**

**Appearances:**

John J. McGrath, Esq., attorney for petitioners

Ingerman Smith, LLP, attorneys for respondent, Susan M. Gibson, Esq., of counsel

## DECISION

Petitioners (the parents) appeal from the decision of an impartial hearing officer which denied their request to be reimbursed for their daughter's tuition costs at the Lawrence Woodmere Academy (LWA) for the 2009-10 school year. The appeal must be dismissed.

At the time the impartial hearing convened in June 2010, the student was attending LWA (Dist. Exs. 45-50). LWA has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7). The student's eligibility for special education and related services as a student with an other health-impairment is not in dispute in this proceeding (see 34 C.F.R. § 300.8 [c][9]; 8 NYCRR 200.1[zz][10]).

## Background

The student attended the district's elementary and middle schools, where she received general education remedial services in reading and math (Tr. pp. 1133-38). In fall 2006 (seventh grade) the parents, upon the suggestion of the math teacher, referred the student to the Committee on Special Education (CSE) due to concerns about her ability to focus, keep up with work in the classroom, and frequent need for clarification (Tr. pp. 1138-39, 1142).

Between December 2006 and March 2007, the district obtained an auditory processing evaluation of the student, conducted speech-language and psychological evaluations, and prepared a social history (Dist. Exs. 14; 15; 16; 35). Results of the auditory processing evaluation indicated weaknesses in the student's auditory closure, speech-in-noise, and phonological awareness skills that negatively affected the student's ability to follow auditorially presented information in environments such as a classroom (Dist. Ex. 14 at p. 3). Language testing indicated that the student's receptive and expressive language, language memory, and auditory perceptual skills were in the average range (Dist. Ex. 15 at p. 3). The school psychologist reported that the student's cognitive skills were generally commensurate with her academic achievement, with her slightly lower achievement scores on written expression and basic mathematical operation tasks seeming "more possibly related to [the student's] emotional and behavioral concerns" (Dist. Ex. 16 at p. 7). The school psychologist indicated that despite the general education support services the student had been receiving, she continued to experience difficulty in school, and at that time her feelings about herself and school were being affected (id.).

In April 2007, the CSE convened and determined that the student was eligible for special education and related services as a student with an other health-impairment, as her central auditory processing delay "impact[ed] progress" (Dist. Ex. 9 at pp. 1-2). The CSE recommended that the student receive three 40-minute sessions per six-day cycle of consultant teacher services in a separate location, as well as a variety of program modifications, testing accommodations, and an FM system (id.). The resultant individualized education program (IEP) noted that the student's "ERSS" counseling, described as building-level general education counseling services provided by a social worker or school psychologist, would continue (Tr. pp. 53, 122-23; Dist. Ex. 9 at p. 4).

During the 2007-08 school year (eighth grade), the student received daily resource room services as well as program modifications, testing accommodations, and use of an FM system consistent with her April 2007 IEP, while attending a district school (Dist. Exs. 8 at pp. 1-2; 9 at pp. 1-2). Over the course of the school year, the student achieved marking period and final grades in the following ranges: French (70-85), algebra 8 (72-80), earth science (65-79), language arts 8 (80-90), and social studies 8 (78-80) (Dist. Ex. 39).

On January 9, 2008, the CSE subcommittee convened for the student's annual review (Dist. Ex. 6).[1] For the 2008-09 (ninth grade) school year, the CSE developed annual goals for the student in the areas of study skills, reading, writing, and social/emotional skills, and recommended that the student receive daily resource room services and one session per six-day cycle of individual counseling (id. at pp. 1, 6-7). Program modifications included preferential seating, refocusing and redirection, directions repeated/clarified, and a copy of class notes (id. at pp. 1-2). The student was also recommended to use an "Apollo" FM system and receive testing accommodations including extended time, starting class tests in the mainstream environment, special location, directions repeated/clarified, and refocusing/redirection (id. at p. 2).

---

[1] According to the CSE chairperson, the annual review was held in January to accommodate the departure of the prior CSE chairperson (Tr. pp. 58-59).

At the commencement of the 2008-09 school year, the student was enrolled in French, living environment, integrated geometry, English 9, global 9, and theater arts classes, and also a geometry "support class" (Tr. p. 254; Dist. Ex. 17 at p. 2).[2]  The student also attended daily resource room and counseling services with the social worker (Tr. pp. 376, 691, 962; Dist. Ex. 6 at p. 1).  She participated in a "club" gymnastics program four evenings per week and once on the weekends (Tr. pp. 1362-63).  Within the first month of the 2008-09 school year, the student requested a change in her math class due to the speed of the teacher's speech, lack of explanation of questions, and lack of structure in the classroom (Tr. pp. 258-61).  After following the district's policy regarding allowing students to change classes/teachers, including a classroom observation by the school psychologist, in early October 2008 the student's math class was changed to accommodate her difficulty with auditory processing (Tr. pp. 258-63, 396-99; Dist. Exs. 20; 21).  The hearing record reflects that the student experienced a somewhat difficult transition from the middle school to the high school, characterized by complaints about specific teachers, difficulty with organization and homework completion, and resistance to the different processes of the high school (Tr. pp. 693-94, 726-27, 731-38, 996-1000, 1163-64, 1169-70, 1457-58).  At the end of the first marking period, the student had achieved the following grades: French (81), integrated geometry (60), living environment (67), English 9 (74), global 9 (78), and integrated geometry lab (85) (Dist. Ex. 17 at p. 2).[3]

On December 8, 2008, the CSE convened at the parents' request (Dist. Ex. 7).  According to the parents, the student was experiencing overall difficulty transitioning to the high school, completing tests in science class due to noise from a nearby music class, and organizing class notes and homework, and she was experiencing increasing difficulty with French class (Tr. pp. 1457-67).  The hearing record indicates that the CSE reviewed the student's transition to the high school and her academic program and progress (Tr. pp. 70-71, 1467-71; Dist. Ex. 7 at p. 5).  The CSE agreed to allow the student to begin science tests in a separate location and added a mathematics annual goal to address concerns regarding math performance (Tr. pp. 70-71; compare Dist. Ex. 6 at pp. 6-7, with Dist. Ex. 7 at p. 7).  Due to time constraints, the meeting was adjourned and the student's father requested that the CSE chairperson schedule another meeting to continue the discussion about his concerns (Tr. pp. 1467-74, 1477).

During the second quarter of the 2008-09 school year, the student participated in both the high school's gymnastic team and the club team (Tr. pp. 1251-53, 1258-59, 1366-67).  The student's second quarter progress report indicated that she was failing French, geometry, living environment, and global 9 (Dist. Ex. 18 at p. 2).  By letter dated December 22, 2008, the principal informed the student and her parents that the student had been placed on academic probation; and unless her performance improved by January 23, 2009, the end of the second

---

[2] The assistant principal of the district's high school reported that support classes "match each of the courses" the district has and provides content related academic intervention services to students who do not achieve a high enough score on State or Regents examinations, or to students who are struggling with specific course material (Tr. pp. 246, 254-57).  Although the student had passed the algebra Regents examination during eighth grade, the district provided her with a geometry support class in ninth grade because her IEP acknowledged that math was a relative weakness for her (Tr. pp. 255-56; Dist. Ex. 17).

[3] The district's math teacher testified that the terms math "support classes" and "labs" are used synonymously (Tr. pp. 599, 614-15).  Additionally, the terms "marking period" and "quarter" are used interchangeably in the hearing record (see e.g. Tr. pp. 267, 274, 337-38; Dist. Ex. 17; Parent Ex. A).

marking period, she would be unable to participate in any sports, plays, and other activities at the high school (Parent Ex. A; see Dist. Ex. 19). The principal's letter provided suggestions to improve the student's grades, including being on time for all classes, attending extra help, completing and submitting homework on time, attending "Resource Centers," and availing herself of tutoring (Parent Ex. A).

The principal reportedly met with the student on January 9, 2009 and they discussed the student's progress, strategies she would use to improve her grades, and a plan to implement the strategies identified (Tr. pp. 391, 405-06; Dist. Ex. 23). According to the principal, the student expressed that she could not attend after school help and got home late due to her participation in gymnastics (Tr. pp. 405-06). The plan developed at the meeting required the student to attend extra help four mornings per week, with at least one session each focusing on French and social studies (Dist. Ex. 23). The student was also required to complete homework assignments and if she did not, she would be required to stay after school (id.). Additionally, the student was required to report to her guidance counselor who would monitor her progress (Tr. p. 991; Dist. Ex. 23). The principal stated that the student was "great about going for extra help," and that she complied with the plan (Tr. pp. 409-10). At the end of the second marking period, the student had achieved the following grades: French (87), integrated geometry (55), living environment (55), English 9 (83), global 9 (65), and integrated geometry lab (85) (Dist. Ex. 17 at p. 3). The hearing record reflects that the special education teacher coordinated information from the regular education teachers about the student's homework and assignments and beginning in January 2009, frequently e-mailed that information to the parents (Tr. pp. 689, 712-18; Dist. Ex. 33).

On February 3, 2009, the CSE reconvened at the parents' request to continue the discussion that began at the December 2008 meeting (Tr. pp. 1477-78; Dist. Ex. 5). The hearing record reflects that the CSE discussed a number of parental concerns, including the need for: (1) greater communication with the student's teachers; (2) an emphasis on improving the student's organizational skills; (3) an exemption from the district's academic eligibility requirements; (4) an exemption from foreign language requirements; and (5) an independent educational evaluation (IEE) in the area of auditory processing (Tr. pp. 76-85, 1477-82; Dist. Ex. 5 at p. 5; Parent Ex. MM). The CSE agreed that the special education teacher would e-mail the parents on a weekly basis to apprise them of how the student was doing and of her responsibilities (Tr. pp. 76-78; Dist. Ex. 5 at p. 5). The CSE discussed that the student did not consistently receive a copy of class notes and that her IEP indicated that she was to receive a copy of class notes as an accommodation (Tr. pp. 77, 1511-12; Dist. Ex. 5 at pp. 2, 5). The CSE noted that the student's IEP contained annual goals in the area of organization, and that the student's special education teacher would assist her with those goals (Dist. Ex. 5 at p. 5). According to the CSE chairperson, at the meeting the CSE discussed that it did not have authority to exempt the student from the high school's academic eligibility requirements, as that was a building-level policy determination (Tr. pp. 82-84; Dist. Ex. 5 at p. 5). The IEP indicated that the CSE considers requests for foreign language exemptions for students with "severe impairments;" and based upon the student's cognitive and academic testing results, and report card grades in French from the end of eighth grade and the first quarter of ninth grade, the CSE determined that the student did not exhibit a severe impairment and declined to find her eligible for a foreign language exemption (Tr. pp. 81-82; Dist. Ex. 5 at p. 5). The CSE agreed to conduct an updated auditory processing evaluation of

the student, noting that the CSE would reconvene to review the results upon receipt of the evaluation report (Tr. pp. 84-85; Dist. Ex. 5 at p. 5).[4]

By letter dated February 12, 2009, the principal informed the parents that the student was no longer on the academic ineligibility/probation list and although it was suggested she continue to do so, she was no longer required to comply with the January 2009 mandated improvement plan (Dist. Ex. 24). The hearing record indicates that the student did not miss school-based gymnastics due to academic probation (Tr. pp. 275, 410).

On February 14, 2009, a private audiologist/speech-language pathologist conducted an auditory and language processing evaluation of the student (Tr. pp. 1822; Dist. Ex. 12).[5] An audiological evaluation revealed that the student's peripheral hearing mechanism was "intact," and that her hearing ability was within normal limits for both ears (Dist. Ex. 12 at pp. 3, 7). Following the administration of assessments measuring the student's auditory, temporal, and phonological processing skills, short-term auditory memory, metalinguistic, and word retrieval skills, the audiologist concluded that the student exhibited an auditory processing disorder (id. at pp. 3-7). Specifically, the evaluation results indicated that the student demonstrated difficulty with auditory closure, figure-ground listening, and integration tasks (id. at p. 7). The student also exhibited difficulty in the metalinguistic areas of understanding meaning from context and inferential skills (id.). The audiologist reported that the student's phonemic awareness skills were not at grade level and that her temporal integration skills were "not evenly developed," which the audiologist indicated could affect her ability to learn a foreign language, listen to fast speakers, and take notes (id. at p. 8). Results of an attention/hyperactivity questionnaire completed by the student's mother identified the student "as having a combination inattentive/hyperactive type of attention deficit," a finding the audiologist indicated needed to be "confirmed by a medical diagnosis" (id. at pp. 7-8). The evaluation report contained numerous recommendations to improve the student's auditory and language processing, including monitoring the student's attention in the classroom, continuing classroom and testing accommodations, a trial of a personal FM system, speech-language therapy, multisensory reading instruction, exemption from foreign language instruction, a technology evaluation, and counseling services (id. at pp. 8-9).

On three dates between February 24, 2009 and March 3, 2009, a private neuropsychologist conducted a neuropsychological evaluation of the student (Dist. Ex. 13).[6] The evaluator described the student as a "generally cooperative, normally related adolescent, who began testing with a not too happy attitude towards the evaluation, but she seemed to adapt as time[] progressed" (id. at p. 5). Administration of the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV) yielded a full scale score and general abilities index score of 105 (63rd percentile, average) (id. at p. 2). The student's perceptual reasoning (39th percentile), working memory (55th percentile), and processing speed (50th percentile) scores were in the

---

[4] The hearing record shows that from February 4, 2009 to March 4, 2009, the CSE chairperson and the parents exchanged correspondence about the issues raised by the parents at the February 3, 2009 CSE meeting (Dist. Ex. 53; Parent Exs. C; D; GG).

[5] The district subsequently funded this evaluation (Tr. pp. 84-85, 1295-96).

[6] The district subsequently funded this evaluation (Tr. pp. 84-85).

average range, with a verbal comprehension (79th percentile) score in the bright normal range (id. at pp. 2-3). The evaluator reported that the student "demonstrated no difficulty with her speech or her language skills," including vocabulary, conceptual language, word retrieval, morpho-syntactic formulation, and language understanding (id. at p. 3). The evaluator's assessment of the student's phonemic awareness and phonemic memory did not reveal any difficulties (id. at p. 4). Academically, the evaluator reported that the student exhibited "adequate," but not particularly strong word recognition skills, and relative weaknesses in phonetic decoding skills that affected her reading fluency (id.). The student's reading vocabulary and comprehension skills were reportedly "normal" (id.). Her spelling skills in isolation were normal; however, on an open-ended writing task her performance was poor regarding spelling, punctuation, capitalization, sentence structure, and complexity (id.).

According to the evaluator, the student's mathematics skills were "remarkably poor," with both computation and fluency skills falling significantly below expectancy (Dist. Ex. 13 at p. 4). Although the student's performance was adequate with regard to number concepts, she exhibited difficulty with problem solving (id.). Results of a rating scale measuring the student's behavior and adjustment that was completed by the student's mother reflected parental concerns regarding the student's anxiety and mood, with the score indicative of attention difficulties falling within the normal range (id. at p. 5). However, the score reflecting the student's self-control was "significantly elevated," and there was "some elevation" in the executive functioning score (id.). The evaluator concluded that the student "was not always well organized in her approach to tasks," and that she exhibited some difficulty with aspects of executive functioning including attention, planning and organizational skills, and working memory (id.). The evaluator provided recommendations and strategies including direct remediation of basic skills in math and writing; accommodations such as use of a calculator, clarification, and reinforcement of content by the special education teacher; use of study guides and class notes; adult tracking of the student's assignments; assistive technology for writing assignments; extended time and separate location for test administration; and counseling services (id. at pp. 6-7).

On April 2, 2009, the CSE convened at the parents' request (Dist. Ex. 4). The hearing record reflects that the CSE reviewed both the auditory and language processing and neuropsychological evaluation reports, and considered the parents' request that the student receive a foreign language exemption (Tr. pp. 85-86, 1298-99; Dist. Exs. 12; 13). Based on information contained in the auditory and language processing evaluation report, the CSE agreed to exempt the student from foreign language instruction (Tr. pp. 86, 89-90, 1299; Dist. Ex. 4 at p. 6). The April 2009 CSE developed additional annual goals for the student in the areas of listening comprehension, written language, and mathematics, and added language to the IEP regarding the special education teacher's responsibility to check the student's agenda book (Tr. pp. 93-95; Dist. Ex. 4 at pp. 6, 8). To support the student's reading and written language deficits identified by the private neuropsychologist, the student's schedule was altered so that she attended a "reading/writing lab," described as a class of three or fewer students that met every other day to work on improving students' reading, reading fluency, comprehension, and writing skills (Tr. pp. 90, 93, 441-42, 474-75, 1299-1300).[7] The CSE agreed to postpone the student's

---

[7] In the third quarter of the 2008-09 school year, the student began attending a living environment support class (Dist. Ex. 17 at p. 4; see Tr. p. 256).

annual review meeting until June to gather information about the effects of the changes to the student's program (Tr. p. 1301; Dist. Ex. 4 at p. 6).

At the end of April 2009 and the conclusion of the third marking period, the student had achieved the following grades: integrated geometry (65), living environment (65), English 9 (79), global 9 (72), and integrated geometry lab (80) (Tr. p. 338; Dist. Ex. 17 at p. 4).

On June 11, 2009, the CSE subcommittee reconvened for the student's annual review and to develop her IEP for the 2009-10 (tenth grade) school year (Dist. Ex. 3). Meeting attendees included the CSE chairperson, a social worker, the school psychologist, the student's guidance counselor, the student's special education teacher, the student's science teacher, the assistant principal, an additional parent member, and the parents (Tr. pp. 541-43, 800-03, 991, 993; Dist. Ex. 3 at p. 6). The hearing record reflects that the student's teachers discussed her progress and reviewed program modifications, testing accommodations, needs, and goals (Tr. pp. 100-01, 291-93; Dist. Ex. 3 at p. 7). The CSE recommended that for the 2009-10 school year, the student receive 40 minutes per day of resource room services, placement in an integrated co-teaching (ICT) math class for three days out of a six-day cycle, and one 40-minute session per six-day cycle of group counseling services (Dist. Ex. 3 at pp. 1-2, 7).[8] Program modifications recommended included preferential seating, refocusing and redirection, directions repeated and clarified, a copy of class notes, and that the special education teacher would check the student's agenda book (id. at p. 2). Testing accommodations included extended time, special location, directions repeated and clarified, and refocusing and redirection (id.). The hearing record indicates that the parents "abruptly" left the meeting prior to its conclusion due to their belief that the CSE did not provide them with specifics regarding the student's progress (Tr. pp. 100, 105, 137-40, 1310-15). According to the CSE chairperson, prior to their departure from the meeting, the parents informed the CSE that they were "going to look for another school" for the student to attend (Tr. p. 105).[9]

Shortly after the June 2009 CSE meeting, the parents submitted an application to enroll the student at LWA and by letter dated June 26, 2009, LWA accepted the student for the 2009-10 school year (Tr. pp. 1377-80; Dist. Exs. 42; 43; 44). The student's fourth marking period/final grades included: integrated geometry (77/65), living environment (73/65), English 9 (90/82), global 9 (82/72), and integrated geometry lab (87/84), and her report card indicated that she had "passed" resource room, and her reading/writing lab and living environment support classes (Dist. Ex. 17 at p. 1).

---

[8] State regulations define ICT services as "the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students" (8 NYCRR 200.6[g]). Effective July 1, 2008, the "maximum number of students with disabilities receiving integrated co-teaching services in a class . . . shall not exceed 12 students" (8 NYCRR 200.6[g][1]). In addition, State regulations require that an ICT class shall "minimally include a special education teacher and a general education teacher" as staffing (8 NYCRR 200.6[g][2]). In April 2008, the Office of Vocational and Educational Services for Individuals with Disabilities (VESID) issued a guidance document entitled "Continuum of Special Education Services for School-Age Students with Disabilities" (see http://www.p12.nysed.gov/specialed/publications/policy/schoolagecontinuum.pdf).

[9] The parents testified that at the CSE meeting they provided the district with verbal notice that they were placing the student in a private school at district expense (Tr. pp. 1315, 1534).

7

The student attended LWA during the 2009-10 school year and received instruction in courses including chemistry, English, U.S. history, and advanced algebra (Dist. Exs. 45-50; Parent Exs. HH; II).

**Due Process Complaint Notice**

In a 32-page due process complaint notice dated February 2, 2010,[10] the parents alleged that the district procedurally and substantively failed to provide the student with a free appropriate public education (FAPE) for "at least" the 2008-09 and 2009-10 school years (Dist. Ex. 1 at pp. 1, 31). The parents provided information relating to the student's educational history and interaction with the district and the CSE dating back to 2002, and alleged that the district denied her a FAPE from when the student was in third grade (2002-03) through seventh grade (2006-07) in violation of its child find obligations under the Individuals with Disabilities Education Act (IDEA) (id. at pp. 2-5). The parents detailed multiple challenges concerning the district's actions relating to the student's seventh grade school year, culminating in an allegation of a procedural and substantive denial of FAPE for the 2006-07 school year (id. at pp. 4-12). The parents also detailed multiple challenges concerning the district's actions relating to the student's eighth grade school year and alleged that the student's IEP for the 2007-08 school year was inappropriate (id. at pp. 12-15).

The parents further alleged, among other things, that they did not receive a copy of the student's January 2008 IEP until August 2008, and that they were advised that the district had reviewed the student's IEP, but they were not provided with the date on which the review took place (Dist. Ex. 1 at p. 19). Regarding the evaluative data upon which the student's IEPs were based, the parents alleged that the January 2008 CSE did not properly consider information relating to the last six months of the student's eighth grade (2007-08) school year in developing her ninth grade (2008-09) IEP because it met in January during the 2007-08 school year, and that the student's January 2008 IEP did not reveal any objective testing beyond assessments on her prior IEP (id. at p. 17).

Further, with respect to the student's IEPs, the parents alleged that the January 2008 IEP: (1) failed to state the student's need for preferential seating with specificity; (2) was devoid of any detail concerning the student's present levels of academic performance; (3) stated that the student was having problems with writing, but contained scant information for use by individuals who would be implementing her IEP; (4) did not appropriately state the student's management needs; and (5) did not contain appropriate goals (Dist. Ex. 1 at pp. 15-16, 18). The parents also alleged that the student's December 2008 IEP contained the same flaws as the January 2008 IEP, thereby denying the student a FAPE, and that no new math goals were added and no changes were made to study skills goals (id. at pp. 23-24). Next, the parents alleged that the student's April 2009 IEP failed to adequately describe how the student's disability affected her involvement and progress in the general education curriculum and that the academic achievement, functional performance, and learning characteristics sections contained inadequate

---

[10] The due process complaint notice is dated February 2, 2009; however, it appears from the context of the hearing record that the notice is misdated and was prepared on February 2, 2010 (see Dist. Ex. 1 at p. 1; Pet. p. 1).

and some inaccurate descriptions of the student (id. at p. 29). They then alleged that the student's June 2009 IEP contained "material misstatements concerning what was discussed at the meeting" and information that was not discussed at the meeting but added after the meeting, denying the parents a meaningful opportunity to participate in the development of the IEP (id. at p. 30).

Regarding the district's recommendations for the student, the parents alleged that the January 2008 CSE recommended adding counseling to the student's IEP without any specifics as to the reason for the service and that the CSE refused the parents' requests in February 2009 to exempt the student from taking a foreign language, refused to exempt the student from sports ineligibility due to subject class failures, and denied their request for an IEE (Dist. Ex. 1 at pp. 15, 26). Additionally, the parents alleged that the student "rarely" received copes of class notes as specified in her January 2008 IEP, and the notes that she did receive were largely illegible, unintelligible, and ineffective in the manner and format in which they were provided (id. at pp. 16, 19-23). They also alleged that the FM unit recommended in the January 2008 IEP "carried a social stigma that hampered its effectiveness," that the principal failed to ensure the student's January 2008 IEP modifications and accommodations were followed, and the student's teachers were negligent in this regard (id. at pp. 16, 20-23).

The parents alleged that the district failed to provide the student with a FAPE "going back more than two years" and that the two year statute of limitations for bringing a claim under the IDEA should be tolled because "due to information that appears to overstate her progress at the middle school," the parents were prevented from learning that the district was not appropriately educating the student and were unaware "their rights were being violated" until the student reached ninth grade (2008-09) (Dist. Ex. 1 at pp. 31-32). The parents stated that the student was in the tenth grade at LWA and alleged that she had made educational progress there, and requested that the district reimburse them for the student's tuition at LWA for the 2009-10 school year, as well as for privately obtained independent evaluations (id. at pp. 1, 32).

**Impartial Hearing Officer Decision**

An impartial hearing convened on June 21, 2010 and concluded on June 20, 2011 after 12 days of proceedings (Tr. pp. 1-2182).[11] In a decision issued on October 6, 2011,[12] the impartial

---

[11] I note that there is nothing in the hearing record that indicates a reason for the inordinate delay between the filing of the due process complaint notice on February 2, 2010 and the issuance of a decision on October 6, 2011 – eighteen months later. Furthermore, no explanation appears in the hearing record why the impartial hearing was not convened for more than four months from the date of the due process complaint notice, why there was over a four month gap between the tenth and eleventh hearing dates, and why the hearing took 12 days of proceedings to complete except for minimal discussion as to the availability of the district's witnesses over the summer, the district's attorney indicating that she was "going on vacation and nobody's stopping [her] from doing that," and the parents' attorney having a medical emergency on one occasion (Tr. pp. 178-79, 188-91, 1389-90). The hearing record also shows that on the last day of proceedings, the impartial hearing officer stated to the parties that they would have to "extend the time limits again" (Tr. p. 2161). Such solicitation on the part of the impartial hearing officer in this case violates federal and State regulations governing impartial hearings, which provide that requests for extensions be initiated by a party, and that the impartial hearing officer's written response regarding each extension request be included in the hearing record, even if granted orally (34 C.F.R. § 300.515; 8 NYCRR 200.5[j][[5]). While the parties may not complain or may even agree that an extension of time is warranted, such agreements are not a basis for granting an extension and the impartial hearing officer has an independent obligation to comply with the timelines set forth in federal and

hearing officer summarized the 100 separately enumerated paragraphs of the parents' due process complaint notice and determined that the parents had therein conceded that the district offered the student a FAPE for the 2007-08 (eighth grade) school year by stating that the student made "'appropriate progress'" (IHO Decision at pp. 6-9). Pursuant to the statute of limitations, the impartial hearing officer determined that the claims by the parents that could be pursued were limited to those commencing on or about February 2, 2008, and that as a result of the parents conceding that the district offered the student a FAPE, the time period from February 2, 2008 to June 30, 2008 was "mooted in terms of remedy" (id. at pp. 9-10). As a result, the impartial hearing officer determined that the issue before him was whether the student was offered a FAPE from June 30, 2008 to February 2, 2010, the date of the request for the impartial hearing, which involved the student's ninth and tenth grade school years (id. at p. 10).

The impartial hearing officer determined that the district met its burden of proof to show that it offered the student a FAPE for the 2008-09 (ninth grade) and 2009-10 (tenth grade) school years, specifying that the student was provided with educational benefits and that there were no procedural violations, which would undermine the provision of a FAPE (IHO Decision at p. 22). He found that the parents were able to present their concerns to the district and that the district made reasonable efforts to meet the student's needs and respond to the parents' concerns (id.). He further found that "differential learning" was use with the student and her specific needs and weaknesses were addressed (id.). The impartial hearing officer credited the testimony of the district witnesses and determined that although the student's disability impeded her, her "attitude" and athletic activities appeared to have "substantially contributed to her difficulties," and that the evidence at the impartial hearing indicated that the student was able to "surmount the problem of poor performance" by putting forth extra effort and "a change in attitude" (id.). He concluded that it was not the student's disability that was the "substantial cause of [the student's]

State regulations (see 34 C.F.R. § 300.515[a]; 8 NYCRR 200.5[j][3][iii], [5]). Moreover, regulatory provisions dictate that extensions of the 45-day timeline may only be granted consistent with regulatory constraints and an impartial hearing officer must ensure the hearing record includes documentation setting forth the reason for each extension (8 NYCRR 200.5[j][5]). The impartial hearing officer is reminded that it is his obligation, regardless of the parties' positions, to ensure compliance with the 45-day timeline for issuing a decision (see Application of a Student with a Disability, Appeal No. 11-115; Application of the Dep't of Educ., Appeal No. 11-037; Application of the Dep't of Educ., Appeal No. 08-061; Application of a Student with a Disability, Appeal No. 08-064). Additionally, State regulations require that in cases where extensions of time to render a decision have been granted, the decision must be rendered no later than 14 days from the date of the record closure (8 NYCRR 200.5[j][5]; see Office of Special Education guidance memorandum dated August 2011 titled "Changes in the Impartial Hearing Reporting System" available at http://www.p12.nysed.gov/specialed/dueprocess/ChangesinIHRS-aug2011.pdf). Finally, I remind the impartial hearing officer that State regulations set forth that each party shall have up to one day to present its case and that additional hearing dates, if required, should be scheduled on consecutive days, when practicable (8 NYCRR 200.5[j][3][xiii]). With regard to this impartial hearing officer, I have previously noted noncompliance with the due process timeline regulations (see Application of the Bd. of Educ., Appeal No. 11-142) and warn that further noncompliances may result in a finding of misconduct (8 NYCRR 200.21[b][4][iii]).

[12] The decision by the impartial hearing officer bears a date of November 6, 2011 (IHO Decision at p. 23). I note that the parents allege that the decision was dated October 6, 2011 and was served by mail on October 7, 2011 (Pet. at p. 1). The district, in a memorandum of law submitted with its answer, similarly states that the decision was issued on October 6, 2011 (Dist. Mem. of Law at p. 1). Additionally, the hearing record reflects that the parents served a notice of intention to seek review in this matter on the district on November 1, 2011 (see notice of intention to seek review).

problems" with consistent achievement and that the student "had the ability to achieve more up to her potential if she was held accountable in attitude and behavior and participated in the extra help and available resources" offered to her by the district (id. at pp. 22-23). Having determined that the district met its burden of proof to show that it offered the student a FAPE for the 2008-09 and 2009-10 school years, the impartial hearing officer declined to address the appropriateness of the parents' unilateral placement and equitable considerations, and denied the parents' request for tuition reimbursement (id. at p. 23).

**Appeal for State-Level Review**

The parents appeal the determinations of the impartial hearing officer that the student's IEPs were appropriate, that the district provided the student with a FAPE for her ninth and tenth grade school years, and that the parents are not entitled to tuition reimbursement for the unilateral placement of the student at LWA. The parents also appeal, among other things, the impartial hearing officer's findings that: (1) no procedural irregularities impeded the student's right to a FAPE; (2) there was consistent and substantial testimony that the student was "'unduly burdened'" by her athletic pursuits, her lack of effort, and her poor attitude; (3) the district's witnesses were credible; (4) the student's problems at school were unrelated to her disability and were primarily based on her focus on her athletic interests, lack of effort, and poor attitude; (5) the student's grades improved when her attitude improved during the second part of her ninth grade school year; and (6) school officials made reasonable attempts to comply with the parents' requests and to assist the student. In a detailed discussion, the parents also challenge many of the statements and conclusions made by the impartial hearing officer, and allege that he summarized his findings and documented testimony rather than making any specific findings of fact and rulings. The parents seek a determination that annuls the impartial hearing officer's decision in its entirety, finds that the district failed to offer the student a FAPE for the 2008-09 and 2009-10 school years, finds that the parents' unilateral placement of the student at LWA was appropriate, and orders that the district reimburse the parents for the student's "tuition and related costs" of placing the student at LWA.

The district submitted an answer to the petition in which it denies many of the substantive allegations made by the parents. Specifically, the district alleges that the impartial hearing officer correctly "limited the issues which could be pursued by the parents in terms of a remedy to those commencing on or about February 2, 2008," that the impartial hearing officer correctly determined that the district provided the student with appropriate IEPs and offered the student a FAPE for the 2008-09 and 2009-10 school years, that the impartial hearing officer correctly denied the parents' request for tuition reimbursement, that the district has no obligation to reimburse the parents for tuition costs at LWA for the 2009-10 school year, and that the parents have not demonstrated that equitable considerations favor reimbursement. The district requests that the decision of the impartial hearing officer be upheld.

**Applicable Standards**

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and

11

independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove v. T.A., 129 S. Ct. 2484, 2491 [2009]; Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (A.C. v. Bd. of Educ., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; A.H. v. Dep't of Educ., 2010 WL 3242234, at *2 [2d Cir. Aug. 16, 2010]; E.H. v. Bd. of Educ., 2008 WL 3930028, at *7 [N.D.N.Y. Aug. 21, 2008]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007] aff'd, 2008 WL 3852180 [2d Cir. Aug. 19, 2008]).

The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]; Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132; E.G. v. City Sch. Dist. of New Rochelle, 606 F. Supp. 2d 384, 388 [S.D.N.Y. 2009]; Patskin v. Bd. of Educ., 583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs (34 C.F.R. § 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; Tarlowe v. Dep't of Educ., 2008 WL 2736027, at *6 [S.D.N.Y. July 3, 2008]), establishes annual goals related to those needs (34 C.F.R. § 300.320[a][2]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (34 C.F.R. § 300.320[a][4]; 8 NYCRR 200.4[d][2][v]; see Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 C.F.R. § 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see M.P.G. v. New York City Dep't of Educ., 2010 WL 3398256, at *7 [S.D.N.Y. Aug. 27, 2010]).

**Discussion**

**2008-09 School Year**

As described above, the student is of average cognitive ability and exhibits an auditory processing disorder, attentional and organizational difficulties, academic weaknesses in math and writing, and social/emotional concerns related to academic and social self-esteem (Dist. Exs. 4 at pp. 2-4; 5 at pp. 2-4; 6 at pp. 2-4; 7 at pp. 2-4; 12; 13; 16). In their due process complaint notice and during the impartial hearing, the parents acknowledged that despite their allegations of deficiencies in the student's 2007-08 IEP, the student experienced success during that school year while receiving daily resource room services, program modifications, and testing accommodations, and using an FM system (Tr. pp. 1160-61, 1165, 1456; Dist. Exs. 1 at pp. 13, 15; 8 at p. 1). For the 2008-09 school year (ninth grade), the January 2008 CSE recommended a special education program consistent with what the student had received the prior year, and added one session per six-day cycle of counseling (compare Dist. Ex. 6 at pp. 1-2, with Dist. Ex. 8 at pp. 1-2). Subsequent IEPs developed during the 2008-09 school year reflected the same

special education program as the January 2008 IEP (compare Dist. Ex. 6 at pp. 1-2, with Dist. Exs. 4 at pp. 1-2; 5 at pp. 1-2; 7 at pp. 1-2).

To address the student's auditory processing difficulties, the 2008-09 IEPs provided the student with preferential seating and use of an FM system, which had been recommended in the student's March 2007 auditory processing evaluation report (Dist. Exs. 4 at pp. 1-2; 5 at pp. 1-2; 6 at pp. 1-2; 7 at pp. 1-2; 14 at p. 3). Other program modifications and testing accommodations provided to the student during the 2008-09 school year, such as extended time, separate location, copy of class notes and assistance with note taking, directions repeated and clarified, and refocusing and redirection, were characterized as being "very helpful" and recommended by the private audiologist to meet the student's auditory processing and attentional needs (Tr. pp. 1871-72, 1875; Dist. Exs. 4 at pp. 1-2; 5 at pp. 1-2; 6 at pp. 1-2, 6; 7 at pp. 1-2; 12 at p. 8).

In conjunction with the program modifications and testing accommodations provided in the student's 2008-09 IEP, the hearing record reflects that the student's educational program of both general education and special education supports appropriately addressed the student's previously identified needs. The student began the 2008-09 school year enrolled in a geometry support class and over the course of the year, was also placed in living environment and reading/writing support classes designed to provide additional assistance in a smaller student-to-teacher ratio to students struggling with content area material (Tr. pp. 254-58, 474-75, 558-59; Dist. Ex. 17). The student also received daily resource room services to address her academic weaknesses and organizational needs (Dist. Exs. 4 at p. 1; 5 at p. 1; 6 at p. 1; 7 at p. 1). The hearing record reflects that the two special education teachers who provided the student's resource room services during the 2008-09 school year performed functions such as reviewing content area material with the student to address her IEP goals, planning study schedules for upcoming tests, ensuring she attended extra help sessions with regular education teachers, checking her agenda book and notifying the parents when assignments were missing, encouraging the student to take notes during class, providing her with class notes, developing flash cards and diagrams for math, and cleaning out her binders and developing a folder system for homework (Tr. pp. 691, 696-99, 700-02, 705-09, 713-19, 802, 808-17; Dist. Ex. 33; see Dist. Ex. 23). To prepare the student for tests, the special education teacher provided her with strategies to eliminate the wrong answers, highlight vocabulary, use graphic organizers, write essays, and complete document based questions (Tr. pp. 709-10).

To further address the student's organizational needs, her 2008-09 IEPs contained annual goals designed to improve her ability to take notes in class, arrive to class with the proper materials, record homework assignments in the agenda book, appropriately maintain notebooks with dividers by subject, and follow oral and written directions (Dist. Exs. 4 at pp. 6-7; 5 at pp. 6-7; 6 at p. 6; 7 at p. 6). In response to the student's relative academic weaknesses, the 2008-09 IEPs provided annual goals to improve the student's ability to use of vocabulary related to the ninth grade curriculum in writing assignments, answer comprehension questions from factual material, verbally identify facts from a story heard auditorially, develop written assignments of at least four paragraphs, summarize facts into complete sentences, diagram math problems, and solve math word problems (Dist. Exs. 4 at pp. 7-8; 5 at p. 7; 6 at p. 7; 7 at p. 7).

14

The student's January 2008 IEP indicated that social situations were difficult for her at times and that she had benefitted from the general education counseling services she had been receiving; therefore, the CSE recommended "mandated" counseling services for the 2008-09 school year (Dist. Exs. 4 at p. 1; 5 at p. 1; 6 at pp. 1, 4-5; 7 at p. 1). During the 2008-09 school year, the district's social worker provided the student's counseling services and her guidance counselor testified at the impartial hearing that she frequently met with the student to discuss the student's concerns (Tr. pp. 376, 962, 998-99). The student's 2008-09 social/emotional annual goals in her IEPs related to her need to verbally discuss ways of developing feelings of self-worth, verbally identify feelings of frustration and identify/implement strategies to deal with frustration, identify strategies for fostering positive peer relationships, seek out appropriate people to ask for help when under stress, display appropriate coping skills when faced with disappointment, and use effective coping strategies in conflict situations (Dist. Exs. 4 at p. 9; 5 at pp. 7-8; 6 at p. 7; 7 at pp. 7-8).

While the hearing record shows that the student experienced academic difficulties during the second quarter of the 2008-09 school year, it also reflects that the student exhibited the ability to improve her attitude and effort toward school, and grades to passing levels by the end of the school year without a significant change in her special education program (compare Tr. pp. 274-75, 466-71, 560-61, 621-22, 651-56, 727-28, 822-28, 878-79, 971-73, 988-89, 1019-21, and Dist. Exs. 17; 51, with Dist. Ex. 6 at pp. 1-2, and Dist. Ex. 4 at pp. 1-2).[13] In consideration of the hearing record as a whole, I find that the district offered the student a FAPE during the 2008-09 school year.

The parents contend that the district failed to act in a timely manner during the 2008-09 school year regarding issues such as changing the student's math teacher, exempting her from foreign language instruction, and communicating with them regarding the student's assignments. Additionally, the parents allege that the district failed to provide the student with copies of usable class notes and with differentiated instruction. The parents also allege that the impartial hearing officer improperly determined that the student's difficulties at school were related to her gymnastics activities and lack of effort. For the reasons discussed below, these assertions are not supported by the hearing record.

Regarding the parents' request to change in the student's math teacher at the outset of the 2008-09 school year, the hearing record reflects that after the district followed its procedure for changing teachers, the student's math class was changed in October 2008 (Tr. pp. 258-63, 601, 934-36; Dist. Exs. 20; 21). The hearing record also shows that the parents' February 3, 2009 request for a foreign language exemption was granted on April 2, 2009 (Dist. Exs. 4 at p. 6; 5 at p. 5). I am surprised by both the parents' request and the district's response, insofar as at the time of the February 2009 request, the student had achieved first and second quarter French grades of 81 and 87, respectively (Dist. Ex. 17 at p. 3); however, I will not disturb the matter because neither party is advocating that the foreign language exemption should not have been granted, and there is no basis to conclude that it should have been granted sooner.

---

[13] I note that the fourth quarter/final grades the student received during 2008-09 were similar to the grades she received during 2007-08 (compare Dist. Ex. 17 at p. 1, with Dist. Ex. 39).

Regarding communication between the parents and the district, the hearing record shows that the CSE convened on three occasions during the 2008-09 school year to address the parents' concerns, and that the special education teachers increased the frequency with which they provided information about the student's assignments to the parents over the course of the school year (Tr. pp. 69-70, 713-19, 811-13, 829; Dist. Exs. 4; 5; 7; 33). The hearing record contains testimony from numerous district personnel who worked with the student during the 2008-09 school year that describes the intensity of their efforts to meet the student's needs and the parents' requests for communication (Tr. pp. 109-11, 284-91, 377-80, 565, 606-08, 611, 622-23, 717-19, 721, 816-17, 973, 1015-16). The student's ninth grade academic course teachers testified that copies of class notes were provided to the student, and her IEPs contained notations that copies of class notes should be provided to her as an accommodation, as well as an annual goal designed to help her improve taking notes in the classroom (Tr. pp. 550-54, 611-17, 874-77, 978-81; Dist. Exs. 4 at pp. 2, 7; 5 at p. 2, 6; 6 at pp. 2, 6; 7 at p. 2, 6). The hearing record provides detailed information about the training the student's ninth grade teachers received regarding differentiated instruction, and the manner in which that was provided to the student (Tr. pp. 414-41, 561-65, 625-33, 879-86, 981-88; Dist. Exs. 25-30).

After a careful review, I find that the hearing record supports the impartial hearing officer's determination that these issues raised by the parents did not result in a failure by the district to provide the student with a FAPE during the 2008-09 school year, especially in light of the volume of testimony that the student's initial reluctant attitude toward school and offers of extra help, and her involvement in extracurricular gymnastics activities, negatively affected her academic performance (Tr. pp. 275-77, 252-53, 301-02, 405-06, 411-12, 464-66, 472-74, 543-44, 573, 602-03, 633-34, 692-93, 696-99, 702-06, 737-39, 805-07, 814-15, 866-68, 870-72, 971, 975, 998-1001, 1008-10, 1362-67; Dist. Ex. 17 at pp. 2-3).

I find that the 2008-09 school year IEPs were substantively appropriate to meet the student's needs and were reasonably calculated to enable the student to receive educational benefits at the time they were formulated. The evidence demonstrates that the 2008-09 IEPs were an appropriate continuation of an educational program that had been providing the student with educational benefits. Her academic progress under her prior school year IEP, when considered together with the various individually tailored special education services, program modifications, and testing accommodations that were offered to her in the 2008-09 IEPs, amply demonstrates that she was offered a FAPE (see Rowley, 458 U.S. at 203 n. 25; S.H. v. Eastchester Union Free Sch. Dist., 2011 WL 6108523, at *10 [S.D.N.Y. Dec. 8, 2011]; Thompson R2–J Sch. Dist. v. Luke P., 540 F.3d 1143, 1153 [10th Cir.2008];. see also D.D-s. v. Southold Union Free Sch. Dist., 2011 WL 3919040, at * 12 [E.D.N.Y. Sept. 2, 2011]; J.G. v. Kiryas Joel Union Free Sch. Dist., 777 F. Supp. 2d 606, 650 [S.D.N.Y. 2011]; M.C. v. Rye Neck Union Free Sch. Dist., 2008 WL 4449338, at *16 [S.D.N.Y. Sept. 29, 2008]). Additionally, the hearing record does not support the conclusion that the district, upon implementing the student's IEPs deviated from substantial or significant provisions of the student's IEPs in a material way and thereby precluded the student from the opportunity to receive educational benefits (Rowley, 458 U.S. at 206-07; A.P. v. Woodstock Bd. of Educ., 2010 WL 1049297 [2d Cir. March 23, 2010]; Cerra, 427 F.3d at 192; see Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811 [9th Cir. 2007]; Houston Independent School District v. Bobby R., 200 F.3d 341, 349 [5th Cir. 2000]; see

also D.D.-S., 2011 WL 3919040, at *13; A.L. v. Dep't of Educ., 2011 WL 4001074, at *9 [S.D.N.Y. Aug. 19, 2011]; Catalan v. Dist. of Columbia, 478 F. Supp. 2d 73 [D.D.C. 2007]).

Moreover, I note that even if the district had not provided a FAPE to the student for the 2008-09 school year, the parents seek only tuition reimbursement for the 2009-10 school year and do not specify any remedy pertaining to the 2008-09 school year (see M.R. v. South Orangetown Cent. Sch. Dist., 2011 WL 6307563, at *13 [S.D.N.Y. Dec. 16, 2011] [precluding the parents from belatedly asserting a claim for compensatory education when it should have been requested in their due process complaint notice]).

**2009-10 School Year**

Next, turning to the 2009-10 school year, I note that the parents do not make specific allegations in the petition regarding which aspects of the June 2009 IEP did not meet the student's needs, or how the IEP failed to offer the student an appropriate special education program.[14] I will nonetheless review the district's recommendations for the 2009-10 school year.

The student's June 2009 IEP present levels of academic performance described the student's difficulty organizing written language assignments and notebooks, and solving multistep math word problems, her struggle with classes that are lecture based, and her tendency to "implore[] task avoidance behaviors" (Dist. Ex. 3 at p. 3). The IEP reflected the results of the February 2009 auditory and language processing evaluation, the March 2009 neuropsychological evaluation, and the vocational "Level One Assessment" conducted by the district during the 2008-09 school year (Tr. pp. 702-03; Dist. Ex. 3 at pp. 3-4). The June 2009 CSE identified the student as needing resource room services to "improve writing skills, multi-step math problem skills, organizational strategies, and task-avoidance issues," and indicated that she would be enrolled in the "Algebra/Trigonometry Lab" to address math deficits (Dist. Ex. 3 at p. 3). The IEP further identified the student's need to use an FM system during classroom lessons, write down homework assignments in her agenda book, and work on developing strategies for organization such as managing her binders and bringing appropriate materials to class, using graphic organizers for written assignments, and developing strategies to solve multistep word problems (id.).

According to the CSE, the student's participation in the theater arts program would help improve her public speaking and social skills (Dist. Ex. 3 at p. 3). In the area of social development, the IEP described the student as "self-conscious," and having a tendency to be "distant" when meeting new people (id. at p. 5). The student was also described as being sensitive, and it was noted that she "may shut down completely" when frustrated (id.). According to the CSE, the student's lack of self-confidence impeded her learning and at times, she felt too intimidated to ask for clarification in larger class settings and used task avoidance behaviors to conceal feelings of inadequacy (id.). The CSE identified the student's need "to

---

[14] A petition for review must comply with section 279.4(a) of the Regulations of the Commissioner of Education, which provides, in pertinent part, that: "[t]he petition for review shall clearly indicate the reasons for challenging the impartial hearing officer's decision, identifying the findings, conclusions and orders to which exceptions are taken, and shall indicate what relief should be granted by the State Review Officer to the petitioner" (8 NYCRR 279.4[a]).

better cope with the frustration of academic demands," increase her self-confidence to ask for help when needed, and interact "more appropriately" with people (id.). The IEP noted that the student would benefit from improving relationships with classmates and teachers (id.). Regarding the student's physical development, the IEP indicated that the student was in good health and that there were no physical or motor needs that required special education at that time (id.).

Transition services information contained in the student's June 2009 IEP described how the resource room and counseling services recommended by the CSE would assist her with transition planning (Dist. Ex. 3 at pp. 5-6). Specifically, resource room services and enrollment in math lab would support her academic weaknesses to enable her to take a course of study leading to a Regents diploma (id. at p. 6). Additionally, counseling services would help the student with individual problems occurring during the school day, and with improving interpersonal skills (id.).

The June 2009 IEP contained annual goals designed to improve the student's ability to arrive on time with appropriate class materials, record homework and school assignments in an agenda book, maintain an organized notebook, construct study guides, and attend to and follow multistep directions (Dist. Ex. 3 at pp. 7-8). In reading and writing, the student's annual goals addressed her need to develop vocabulary, reading comprehension, and sentence and paragraph composition skills (id. at pp. 8-9). The student's mathematics goals were designed to improve her ability to develop diagrams for math problems, translate two-step verbal expressions into algebraic expressions, and solve multistep and word problems (id. at p. 9). In the social/emotional domain, the student's annual goals focused on improving her use of stress reduction strategies to reduce test anxiety; relationships with classmates and teachers; ability to identify examples of how her feelings influenced behavior; and display of appropriate coping skills (id. at pp. 9-10). Additionally, the IEP contained one annual goal indicating that after the completion of vocational assessments, the student would indicate areas of interest, strength, and weaknesses (id. at p. 10).

As previously noted, for the 2009-10 school year, the CSE recommended that the student receive 40-minutes per day of daily resource room services, placement in an ICT math class for three days of a six-day cycle, and one 40-minute session per six-day cycle of group counseling services (Dist. Ex. 3 at pp. 1-2, 7). According to the CSE chairperson, the ICT math class was supported by a special education teacher every other day and a teaching assistant on the alternating days, which assistant worked under the supervision of the special education teacher (Tr. pp. 101-02). Recommended program modifications included preferential seating, refocusing and redirection, directions repeated and clarified, a copy of class notes, and that the special education teacher would check the student's agenda book (Dist. Ex. 3 at p. 2). Testing accommodations included extended time, special location, directions repeated and clarified, and refocusing and redirection (id.).

In light of the evidence described above regarding evaluative information in the hearing record and the statement of the student's present levels of performance in the June 2009 IEP, I find that the June 2009 CSE accurately set forth written statements of the student's needs, addressed those needs through appropriate program modifications, testing accommodations,

annual goals, and a special education program of resource room and counseling, in conjunction with general education supports. Based upon a careful review of the evidence contained in the hearing record, I conclude that the June 2009 IEP proposed for the 2009-10 school year was reasonably calculated to enable the student to receive educational benefits in the LRE and that the student was offered a FAPE (see Rowley, 458 U.S. at 206-07; Cerra, 427 F.3d. at 192).

### Procedural Challenge

With respect to the parents' challenge to impartial hearing officer's determination that there were no procedural irregularities that impeded the student's right to a FAPE, I note that the parents have not identified any specific procedural claim that the impartial hearing officer should have decided differently. In light of my determinations above and my independent review of the evidence in the hearing record, I agree with the impartial hearing officer insofar as any procedural defects in this case did not (a) impede the student's right to a FAPE, (b) significantly impede the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) cause a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]).

### Conclusion

Having determined that the district met its obligation to offer the student a FAPE for the 2008-09 and 2009-10 school years, it is not necessary to reach the issue of whether LWA was appropriate for the student or whether equitable considerations support the parents' claim and the necessary inquiry is at an end (M.C. v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]; Walczak, 142 F.3d at 134; E.M., 2011 WL 1044905, at *10; Application of a Child with a Disability, Appeal No. 08-158; Application of a Child with a Disability, Appeal No. 05-038).

I have considered the parties' remaining contentions and find that I need not address them in light of my determinations herein.

**THE APPEAL IS DISMISSED.**

Dated:     Albany, New York
           January 19 , 2012

           JUSTYN P. BATES
           STATE REVIEW OFFICER